AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. 19-mj-8091-DLB |
| ROBERT JAY GOLDSTEIN | ) | |
| | ) | FILED BY  SP  D.C. |
| | ) | |
| *Defendant(s)* | | MAR 25 2019 |
| | | ANGELA E. NOBLE |
| | | CLERK U.S. DIST. CT. |
| | | S.D. OF FLA. – W.P.B. |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 21, 2019 in the county of PALM BEACH in the SOUTHERN District of FLORIDA, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 922(g)(1), 924(a)(2) | Possession of a Firearm and Ammunition by a Convicted Felon |

This criminal complaint is based on these facts:

PLEASE SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

*Complainant's signature*

Sara Connors, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3-25-2019

City and state: West Palm Beach, Florida    Hon. Dave Lee Brannon, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT
OF
SARA CONNORS
SPECIAL AGENT
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES**

Your affiant, Sara Connors, first being first duly sworn, does hereby depose and state as follows:

1. Your affiant is employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and has been so employed since 1999. Your affiant's responsibilities include investigating violations of federal law, including violations of the Gun Control Act (Title 18, United States Code, Chapter 44). During your affiant's tenure with ATF, your affiant has personally participated in excess of 300 prior investigations of convicted felons in possession of firearms.

2. Your affiant submits this affidavit in support of a Criminal Complaint for defendant **Robert GOLDSTEIN** (hereinafter "GOLDSTEIN"). Because this affidavit is being submitted for the limited purpose of obtaining an arrest warrant, it does not contain all the information known regarding this investigation, but rather those facts necessary to establish probable cause to believe that GOLDSTEIN, a previously convicted felon, was in possession of a firearm that affected interstate commerce on or about March 21, 2019, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

3. Your affiant is aware that at all times material hereto, that is, prior to March 21, 2019, defendant Robert GOLDSTEIN was a convicted felon, having been convicted of at least the following offenses each of which was punishable by imprisonment for a term exceeding one year:

    a.) On or about June 19, 2003, defendant GOLDSTEIN was convicted in the United States District Court for the Middle District of Florida, in Case No. 03-CR-116-T-30MAP of Conspiracy to Violate Civil Rights; Attempted Damage

to Religious Property and Obstruction of Persons in the Free Exercise of Religious Beliefs; and, Possession of Unregistered National Firearms Act Firearms, and was sentenced to a term of 120 months' imprisonment; and,

       b.)       On or about June 16, 2014, defendant GOLSTEIN was convicted in the United States District Court for the Southern District of Florida, of Possession of a Firearm and Ammunition by a Convicted Felon, in Case No. 14-80022-Cr-MIDDLEBROOKS, and was sentenced to a term of 24 months' imprisonment. According to information furnished by the United States Probation Office, the defendant terminated supervised release for this offense on October 27, 2018.

4.       On March 21, 2019, officers of the Tequesta Police Department (TPD) responded to a residence located at 16 Live Oak Circle in the Village of Tequesta, Palm Beach County, Southern District of Florida, in reference to a welfare check/suspicious incident. Upon arrival, officers met with M.G., defendant GOLDSTEIN's spouse, who stated that her husband, ROBERT GOLDSTEIN (a previously convicted felon) was armed with a gun and was upstairs, barricaded in the bedroom with her adult daughter (hereinafter referred to as "A.T.") who was suffering from an undisclosed medical condition and possibly not breathing. Officers made entry into the house through the side door on the lower level, removing "A.T." safely. Based on the information related by M.G., TPD officers understood GOLDSTEIN to be located on the top, or second floor of the residence together with A.T. After announcing their police presence, and calling out to the occupants of the upper level, A.T. came down the stairs first, followed a short time later by GOLDSTEIN, who was ordered to show his hands and proceed downstairs.

5.       Upon being taken into custody, GOLDSTEIN was advised of his *Miranda* warnings by TPD Officer Baldwin from a preprinted form, and GOLDSTEIN advised he understood his rights. GOLDSTEIN thereafter stated he stated he was aware that there were many firearms in the house, secured in two safes and other locations around the house. GOLDSTEIN advised that the firearms and the safes belonged to his wife. GOLDSTEIN's wife, M.G., was also on the scene at

2

the time of defendant GOLDSTEIN's arrest. TPD Detective Sergeant interviewed M.G. at the residence. M.G. stated she was scared that GOLDSTEIN would be released from custody and she told Sgt. Muniz she wanted all firearms and bladed weapons out of her house. M.G. showed officers GOLDSTEIN's tactical vest, which was located in the master bedroom closet on the lower rack, between men's shirts. Located in the tactical vest in a Velcro strap holster was a loaded Glock 43 pistol, two (2) 30 round magazines, and one 8 round magazine.

6. Consistent with her request to remove all firearms from her residence, M.G. showed Sgt. Muniz where firearms were located in the house. M.G. showed Sgt. Muniz a small safe in the closet off of the master bedroom. M.G. was able to locate a key for the safe. It was opened and officers removed 7 Heckler & Koch pistols, 3 Glock pistols, 1 Ruger pistol, 1 Walther pistol, and 1 Colt pistol. S/A Mark Finnamore, who has been trained by ATF in the identification and interstate nexus of firearms, was able to examine three of these firearms and determined all of those firearms had traveled in and affected interstate or foreign commerce. The three firearms that S/A Finnamore was able to examine include:

- Ruger model SR1911, .45 caliber pistol,, serial number NSF167
- Heckler & Koch model USP compact .45 caliber pistol serial number 29-103406
- Glock model 19 9mm pistol, serial number BGUY902

M.G. also took officers to a safe in the garage with a combination. M.G. stated that she did not know the combination to this safe, but guessed, and gave officers a few series of numbers that might able to open it. Officers were not able to open the safe using the codes provided by M.G.

7. M.G. gave Sgt. Muniz a "Tupperware" type bin containing firearm-related purchases. M.G. told Sgt. Muniz that she purchased the guns in the house for her husband, at his request.

3

8. After GOLDSTEIN's arrest, M.G. was escorted to the Tequesta Police Department where she gave a sworn recorded statement. According to Sgt. Muniz, M.G. told him that GOLDSTEIN convinced her to obtain a concealed carry permit and purchase a "Seecamp" pistol for her protection. GOLDSTEIN continued to persuade M.G. to purchase firearms locally at Gun Ho, a federally licensed firearm dealer, located in Tequesta, Florida. GOLDSTEIN would transfer money via his credit card so M.G. could purchase firearms on gunbroker.com. GOLDSTEIN would clean, handle, and secure the firearms inside the home. M.G. further stated that she did not want the firearms that were seen in plain view when the police responded to the house, or the firearms that were concealed inside the house. M.G. further stated that she did knew of firearms that were in the safes in the house, but did not know exactly how many firearms of what types were located within. M.G. was also interviewed regarding domestic violence related incidents that occurred earlier that evening and also earlier in the week.

9. The following day, March 22, 2019, ATF Special Agent Mark Finnamore and ATF Task Force Officer (TFO) Casey Goetz conducted a recorded interview with M.G. at her residence. M.G. invited Goetz and Finnamore into her house and agreed to be interviewed. During the interview, M.G. told S/A Finnamore that she had done some research and realized that she is a "straw purchaser" of firearms for her husband. M.G. stated that she has a Gunbroker account,[1] and that her husband would log onto her account, and shop for firearms. M.G. said that once she

---

[1] Your affiant is aware that Gunbroker is an online brokerage service similar to Ebay for firearms. Once a firearm is purchased, however, the transfer of the firearm must be completed through a federally licensed firearms dealer.

4

picked up the firearms, using her identification, they would be turned over to GOLDSTEIN. M.G. picked up the firearms from a gun store which she referred to as "Gun Ho." Your affiant is aware that this gun store, a federally licensed firearms dealer, is now doing business name of "MikeLen SA Firearms". According to ATF records, this firearm licensee moved from Tequesta, Florida, to Lake Park, Florida, in June of 2018.

10. According to M.G., GOLDSTEIN would keep the firearms in the safes that he (defendant GOLDSTEIN) had access to, and would also clean them on occasion. M.G. stated that GOLDSTEIN told her if the police were ever called to the residence, he did not want to return to prison, and would shoot it out with the police. In addition, GOLDSTEIN told her that if he was losing the battle with the police, he would barricade himself upstairs with his wife, he would kill her, set the house on fire, and kill himself. It should be noted in this regard that SA Finnamore observed a can of gasoline in the upstairs office of the residence.

11. M.G. stated that she had her concealed weapons permit. M.G. also stated that she purchased one gun for herself, which she kept in her vehicle. M.G. provided consent to S/A Finnamore and TFO Goetz to search her vehicle. TFO Goetz searched the vehicle and recovered a Seecamp, .32 caliber semi-automatic pistol, serial number 15931 from the center console. M.G. told agents that for several nights, GOLDSTEIN had slept with her daughter in her daughter's bed. M.G. stated that GOLDSTEIN would give her daughter money to purchase cocaine and pills from 45th Street in Riviera Beach.

12. On March 22, 2019, your affiant conducted an interview with an individual hereinafter referred to as "C.T.". C.T. stated that she is one of M.G.'s daughters, and that Robert GOLDSTEIN is her stepfather. C.T. currently lives in Captiva, Florida, and traveled to Palm

Beach County, after overhearing a domestic argument between her mother and stepfather the previous evening (March 21) on the phone. C.T. stated that while on the phone with her mother, she could her mother screaming and her stepfather threatening her mother and telling her not to call the police. C.T. stated that a few days prior, her mother told her that "Bobby" (defendant GOLDSTEIN) had changed the code to the firearms safe and that she no longer had access to any of the guns. After hearing the fight over the phone, and while still in Captiva, C.T. stated she called the Tequesta Police Department, requesting help. After talking to the police, C.T. received another phone call from her mother, who said she'd been physically harmed by defendant GOLDSTEIN, at which time C.T. told her mother to run out of the house. C.T. then heard the police arrive through the open connection on the phone.

       13.    After hearing the argument, C.T. drove to Palm Beach County and stayed with her sister at Jupiter Medical Center, where she was receiving medical treatment. C.T. referred to GOLDSTEIN as a guy who preys on broken women and girls who have "Daddy" issues. C.T. recalled that two Christmases ago (which would be Christmas of 2017), GOLDSTEIN tried to give her a white pill and alcohol. Later, she was in bed when GOLDSTEIN climbed into bed with her and began rubbing her thigh. C.T. did not let this behavior continue, but did not tell her mother that it occurred until recently. C.T. knows her mother to have one gun for her protection, and that she knew GOLDSTEIN had air-soft type weapons. She did not know there were that many guns in the house until her mom told her recently. C.T. stated that her mother told her that if the police were called, GOLDSTEIN would shoot her sister, shoot her mother, and then shoot himself.

       14.    On March 22, 2019, your affiant conducted a recorded interview with "A.T." A.T. said that she had just been released from Jupiter Medical Center but that she was feeling okay and

she agreed to a voluntary interview. A.T. stated that she had been living in Tequesta with her mother (M.G.) and Robert GOLDSTEIN since approximately December of 2018. A.T. stated that lately things had gotten very violent around the house between her mother and stepfather and that she wanted to move out. A.T. said that things had been going downhill in her life recently, and that she had turned from doing drugs to drinking very heavily. A.T. said that she had very little recollection of the events that occurred the night before. A.T. knew that there were guns inside the house. At first, A.T. stated that she did not know if the guns belonged to her mother or to GOLDSTEIN. A.T. stated she is on a "plea and pass" in the state case for domestic abuse and that she can't be around guns. A.T. said that GOLDSTEIN has guns as his hobby. A.T. stated that she was afraid that if GOLDSTEIN got out, he could try to hurt her, her mom and her sister. She had been in a physical fight with her mother, and GOLDSTEIN on an earlier date. A.T. stated that it would not surprise her if GOLDSTEIN tried to hurt her with a gun on a later date.

15. A.T. Said that she had seen GOLDSTEIN looking at guns online. A.T. believed when he was looking at guns online, he was shopping for them. A.T. said that GOLDSTEIN doesn't have a job, and all day he sits on the couch, watches TV, and goes on his computer. A.T. believes he gets money from his parents. A.T. was upset because she used to trust GOLDSTEIN before he became "too friendly." Later in the interview, A.T. sated that she told GOLDSTEIN that she was not comfortable with guns being in the residence, to which he stated that it was his house, he pays half the rent, and that he likes guns. A.T. stated that the fighting between her mother and GOLDSTEIN had gotten worse, and for several nights, GOLDSTEIN slept in her (A.T.'s) bed. This made A.T. uncomfortable, but she did not want to "stir the pot." A.T. stated that sometimes during the fights between her mother and her stepfather, a gun would be "right there."

16. A.T. stated that there was a time when she was using cocaine that she would purchase from 45th Street. A.T. denied getting any of her drug money from GOLDSTEIN. At the end of the interview, A.T. stated that she got a call from GOLDSTEIN while he was in jail, and he apologized to her for not believing her that she was so sick and for not taking her to the hospital.

17. On March 22, 2019, a state search warrant, was obtained for the residence of 16 Live Oak Circle in Tequesta, Florida, by TPD officers. Your affiant and several other ATF Agents and Task Force Officers were present for the execution of the search warrant. Once the scene was secure, Palm Beach County Sheriff's Office bomb technicians entered the residence through the garage and completed an explosive x-ray check on the safe on the southeast wall in the garage. The x ray did not appear to show explosives, but ammunition and firearm magazines. After the x-ray was completed, ATF accelerant detection K-9 "Babs" and her handler, S/A Dodds, entered the residence to check for explosives, explosive material, firearms and ammunition.

18. ATF Agents conducted a video walk-through of the residence in its current condition before the searching began. Once the search began, Tequesta PD Officers, assisted by ATF Agents, conducted a thorough search of the residence.

19. As your affiant was searching the living room, she noticed several footrests that were located adjacent to the couch. The footrests were "storage" type footrests, in where the top lifted up and the item became a storage container as well as a footrest. Your affiant searched the inside of the footrests. Inside the second one search, your affiant observed a pillow on the top of the container. Underneath the pillow were several plastic containers, a bag full of cardboard tubes with end caps, and hobby fuse. One of the containers was labeled "flash powder", another was labeled "potassium perchlorate" and your affiant could not see the labels on the other three

8

containers. At the advice of the bomb squad, your affiant did not touch any of these items to examine them further. At this time, the search had to be briefly paused. All law enforcement had to exit the residence, and the PBSO Bomb Squad had to bring a "containment" vehicle to remove these items from the footrest.

20. After the bomb squad effectively removed the powders from the living room, they assisted with the opening of the safe in the garage. Inside the safe, agents recovered numerous rounds of ammunition. This ammunition included shotgun shells and rifle ammunition. It should be noted that the firearms that take this type of ammunition was not yet recovered by the Tequesta Police Department. Based on the type of this ammunition, agents suspected that there must be firearms hidden in the house that had not yet been recovered. Tequesta Police Officers, S/A Gonzalez, and S/A Finnamore began conducting a search of the mounted wall unit (hereinafter "the wall unit") which held the television in the living room. Agents and officers noticed anomalies in the sides of the unit. Using a hammer and tools, agents removed the wood paneling from the left side of the wall unit, and discovered a hollow compartment concealed therein, containing firearms and ammunition which has been secreted inside the compartment. Using fresh gloves, S/A Finnamore retrieved the weapons, all of which were loaded, and made them safe. An inventory of these weapons includes the following:

- Pioneer Arms, AK-47 style pistol, serial number PAC11197544 (no ammunition in the chamber but was loaded with one extended magazine containing unknown rounds of ammunition)
- Century Arms, model AK-63DS, AK-47 style pistol, serial number AK63DS-F04881 (no ammunition in the chamber but was loaded with one extended magazine containing unknown rounds of ammunition)
- Mossberg model 590 12 gauge shotgun, serial number V0811315 (loaded with two rounds of ammunition)

9

- Black Aces ProSeries 12 gauge tactical shotgun, serial number PS50033AA which was loaded with four rounds of 12 gauge ammunition.

In addition, inside the wall unit, agents recovered the following items from the wall unit:

- One box of Fiocchi 12 gauge shotgun ammunition
- 2 "AK-47 banana" style magazines, which were loaded with unknown rounds of ammunition
- 2 grenades and "look-alike" TNT, which appeared to be fake/replicas, but were transferred over to the PBSO bomb squad
- One "air-soft" landmine

21. Your affiant has consulted with ATF Resident Agent in Charge Robert Shirley, who has been previously qualified as an expert in the interstate nexus of firearms and ammunition in the Southern District of Florida. RAC Shirley on scene at the search warrant and viewed the firearms that were retrieved from the wall unit. RAC Shirley stated that the following firearms were manufactured outside the state of Florida, and therefore these firearms had traveled in interstate commerce.

- Pioneer Arms, AK-47 style pistol, serial number PAC11197544 (no ammunition in the chamber but was loaded with one extended magazine containing unknown rounds of ammunition)
- Century Arms, model AK-63DS, AK-47 style pistol, serial number AK63DS-F04881 (no ammunition in the chamber but was loaded with one extended magazine containing unknown rounds of ammunition)
- Mossberg model 590 12 gauge shotgun, serial number V0811315 (loaded with two rounds of ammunition)

As it relates to the Black Aces tactical shotgun, RAC Shirley could not made a determination on scene as to the nexus of this firearm at this time, and stated it would need additional research. RAC Shirley viewed the box of Fiocchi ammunition and determined that it had traveled in interstate/foreign commerce.

22. In addition to the firearms seized from the wall unit, agents and police officers seized several other items from the residence. These items include but are not limited to: cellular phones, laptop computers, firearm related paperwork, firearm related literature, firearm magazines, and a copy of "The Anarchist's Cookbook." Your affiant knows from training and experience that "The Anarchist's Cookbook" is a book that was published in the 1970's that contains instructions for the manufacture of improvised explosives and weapons.

23. Your affiant reviewed inmate phone recordings from the Palm Beach County Jail. On March 23, 2019 at 10:15 a.m., GOLDSTEIN called A.T. A.T. told GOLDSTEIN that she didn't tell the police anything about them. During the call, A.T. tells GOLDSTEIN repeats several times that she didn't want to "talk on the phone". GOLDSTEIN says "your mother wrecked my life, I'm going away forever." In the call, it is very clear that A.T. and GOLDSTEIN have a romantic relationship. GOLDSTEIN, while sobbing crying, tells her that he loves her and wanted a life with her. During the call, GOLDSTEIN says "They're gonna make me out to be a terrorist and I just have some bad hobbies." A.T. says tells him that everything is in her mother's name and was kept in safes. During the call, GOLDSTEIN tells A.T. some of his banking information so she could put money on his inmate account.

24. On March 23, 2019, at 10:47 a.m., GOLDSTEIN called his parents. During the call, GOLDSTEIN talks to his father. GOLDSTEIN's father told him. "I told you-you lied. She lies. And now you're gonna pay a terrible price" "But you didn't ever listen. You told her to go get those guns. I told you to sell them, you told me she sold them." GOLDSTEIN replied, "Okay," and then continued to ask his father for trust fund money. Later in the call, GOLDSTEIN's father tells him, "I begged you, don't have any guns. And you did nothing Rob. You told her to put

11

them in the safe". GOLDSTEIN's father continues to tell him that he shouldn't have had guns. GOLDSTEIN repeatedly apologizes to his father, who replied, "I'm sorry you never listen".

25.   WHEREFORE, on the basis of the foregoing, your affiant respectfully submits that probable cause exists to charge Robert GOLDSTEIN with the offense of the unlawful possession of firearms and ammunition by a convicted felon in violation of Title 18, United States Code, Section 922(g)(1) and 924(a)(2).

FURTHER YOUR AFFIANT SAYETH NAUGHT

*[signature]*

SARA CONNORS
SPECIAL AGENT
BUREAU OF ALCOHOL, TOBACCO, FIREARMS
& EXPLOSIVES

SWORN TO AND SUBSCRIBED BEFORE
ME THIS  25 TH DAY OF MARCH, 2019
AT WEST PALM BEACH, FLORIDA,
SOUTHERN DISTRICT OF FLORIDA.

*[signature]*

**HON. DAVE LEE BRANNON**
**UNITED STATES MAGISRATE JUDGE**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## PENALTY SHEET

Defendant's Name:  ROBERT JAY GOLDSTEIN

Case No.: _____

**Count # 1**

Felon in Possession of Firearms and Ammunition
Title 18, United States Code, Sections 922(g)(1), 924(a)(2)

**Max. Penalty**: 0-10 years' imprisonment; $250,000 fine; 0-3 years' supervised release: and, a $100.00 special assessment.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: _____

### BOND RECOMMENDATION

DEFENDANT: ROBERT JAY GOLDSTEIN

PRETRIAL DETENTION is recommended

~~(Personal Surety) (Corporate Surety) (Cash)~~ (Pre-Trial Detention)

By: _____
AUSA: JOHN C. McMILLAN

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s): ATF S/A SARA CONNORS
(FBI) (SECRET SERVICE) (DEA) (IRS) (ICE) **(OTHER)**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

ROBERT JAY GOLDSTEIN,

                Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Miami Office of the United States Attorney's Office prior to July 20, 2008?

    Yes        X No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office (West Palm Beach Office) only prior to December 18, 2011?

    Yes        X No

3. Did this matter originate from a matter pending in the Fort Pierce Office of the United States Attorney's Office prior to August 8, 2014?

    Yes        X No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: _____
JOHN C. McMILLAN
ASSISTANT UNITED STATES ATTORNEY
Admin. No. A5500228
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
Office:   (561) 820-8711
John.mcmillan@usdoj.gov